IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **INSURANCE COMPANY OF THE WEST,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| v. | )    **CIVIL ACTION 11-0575-WS-N** |
| | ) |
| **OLLINGER CONSTRUCTION, INC.,** | ) |
| | ) |
|     **Defendant.** | ) |

**ORDER**

    This matter comes before the Court on plaintiff's Motion for Summary Judgment (doc. 26). The Motion has been briefed and is now ripe for disposition.[1]

**I.  Nature of the Case.**

    Plaintiff, Insurance Company of the West ("ICW"), brought this action seeking exoneration of surety against defendant, Ollinger Construction, Inc. ("Ollinger Construction"). The Complaint alleges that ICW issued certain performance and payment bonds on Ollinger Construction's behalf, and that it subsequently received claims from subcontractors, laborers and materialmen under the payment bond. ICW alleges that it has settled and paid claims in excess of $150,000 under that bond. In this action, ICW seeks to recover those amounts (plus attorney's fees, interest, and costs) from Ollinger Construction on the theory that Ollinger Construction is

---

[1] The Rule 16(b) Scheduling Order entered on April 17, 2012 provides that "[i]f a party's exhibits in support of or in opposition to a motion exceed 50 pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to the Judge's chambers by mail or hand delivery." (Doc. 22, § 13(c).) Neither side complied with this requirement, despite the fact that defendant filed more than 100 pages of exhibits with its opposition (doc. 31) and plaintiff submitted another 100+ pages of exhibits with its reply (doc. 34). Also, the parties' exhibits are cluttered with multiple identical copies of many exhibits, forcing the Court to sift through redundant and duplicative materials in order to locate particular items. Nonetheless, the Court in its discretion will consider these exhibits as submitted.

obliged to indemnify it under the terms of a certain General Indemnity Agreement.[2]  Ollinger Construction denies liability to ICW, reasoning that it was not a party to the subject agreement and that such agreement has been terminated.

## II.     Factual Background.[3]

### A.     *The General Indemnity Agreement.*

On or about February 6, 2004, a General Indemnity Agreement (the "Agreement" or the "February 2004 Agreement") was executed by a construction company called Ollinger/Mostellar & Associates, Inc. ("Ollinger/Mostellar"), in favor of ICW as surety.  (Four individuals also executed the Agreement as indemnitors bound to the same indemnity obligations as Ollinger/Mostellar was.)[4]  In that Agreement, Ollinger/Mostellar agreed to "indemnify and keep indemnified [ICW] against any and all liability for losses and expenses of whatsoever kind or nature, including attorney fees and costs, by reason of having executed or procured the execution of Bonds, or by reason of the failure of [Ollinger/Mostellar] to perform or comply with the covenants and conditions of this Agreement."  (Fuller Aff. (doc. 29, Exh. 1), ¶ 2 & Exh. A, at § 1.)  The Agreement further specified that if ICW "believes it may sustain a loss or expense on a bond, [ICW] may, from time to time, demand, and … [Ollinger/Mostellar] shall deliver over to [ICW], cash or collateral acceptable to [ICW] as to amount and form, to cover any contingent losses or expenses and any subsequent increase thereof."  (*Id.*, § 2.)  To the extent that ICW commenced legal action against Ollinger/Mostellar to enforce the Agreement, "the prevailing

---

[2]   This claim sounds exclusively under Alabama state law.  Although no federal question is joined herein, federal subject-matter jurisdiction was properly invoked by plaintiff pursuant to 28 U.S.C. § 1332, inasmuch as the well-pleaded allegations of the Complaint establish that there is complete diversity of citizenship and that the amount in controversy substantially exceeds the sum of $75,000, exclusive of costs and attorney's fees.

[3]   The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, defendant's evidence is taken as true and all justifiable inferences are drawn in its favor.

[4]   All told, the signatories to the Agreement were as follows:  Wayne B. Mostellar (as President of Ollinger/Mostellar), Tom P. Ollinger (as CEO & Secretary of Ollinger Mostellar), Wayne B. Mostellar (in his individual capacity), Virginia M. Mostellar, Tom P. Ollinger (in his individual capacity), and Lucille Jackson Ollinger.

party in such action shall be entitled to recover from the other party or parties its reasonable attorney fees and witness fees, and all other costs." (*Id.*, § 21.)

Four features of the Agreement are particularly relevant to this dispute. First, Ollinger/Mostellar and the named indemnitors were not simply binding themselves, but specifically represented that they were acting "for themselves and their heirs, executors, administrators, successors, and assigns." (*Id.* at 1.) Thus, the Agreement was binding not only on Ollinger/Mostellar, but also on its successors in interest. Second, in a section bearing the heading "Preservation of Surety's Rights," the Agreement specified that Ollinger/Mostellar "shall continue to be bound under this Agreement even though [ICW] … has accepted or released or may in the future accept or release, other agreements of indemnity or collateral, from [Ollinger/Mostellar] or others, in connection with the execution of Bonds." (*Id.*, § 17.) In other words, although ICW might choose to enter into or not to enter into indemnity agreements with anyone else in connection with the issuance of bonds, Ollinger/Mostellar would retain its indemnity obligations specified in the Agreement. Third, the Agreement provided that ICW's "rights and remedies … under this Agreement may not be waived or modified except by written amendment signed by" ICW. (*Id.*, § 19.) Thus, mere oral assurances or promises by ICW not to enforce or pursue indemnification remedies under this Agreement would be of no legal force and effect, under the plain terms of the contract. And fourth, the "Termination" clause specified that the Agreement "remains in full force and effect until terminated," that an indemnitor could only terminate the Agreement upon 30 days' written notice to ICW, and that any such "notice of termination shall operate only with respect to those upon whose behalf such notice was given." (*Id.*, § 20.)

### B. *Ollinger/Mostellar Becomes Ollinger Construction.*

In April 2006, the two principals of Ollinger/Mostellar, Tom Ollinger and Wayne Mostellar, decided to part ways. (Allain Aff. (doc. 31, Exh. F), ¶ 3.) At that time, Tom Ollinger purchased Wayne Mostellar's share of Ollinger/Mostellar and changed the name of the company to Ollinger Construction, Inc. (*Id.*)[5] The following month, an individual named Alexander Allain purchased Ollinger Construction, Inc. from Tom Ollinger. (*Id.*, ¶ 4.)

---

[5] This name change is memorialized in a document filed with the Alabama Secretary of State styled "Articles of Amendment to the Articles of Incorporation of (Continued)

Shortly after these changes occurred, Wayne and Virginia Mostellar (two of the indemnitors in the Agreement) invoked the termination provision of the Agreement. In particular, on July 18, 2006, the Mostellars' counsel sent a letter to ICW, the body of which read as follows: "We represent Wayne B. Mostellar and Virginia M. Mostellar. Without implying that any indemnification is presently in effect, this is formal confirmation of termination pursuant to paragraph 20 of the General Indemnity Agreement. Should you have any questions, please contact me. Thank you." (Doc. 31, Exh. A.)[6] The Mostellars' counsel neither represented nor purported to represent Ollinger Construction in connection with this termination notice. (Davis Aff. (doc. 31, Exh. C), ¶ 4.) For their part, neither Ollinger/Mostellar nor Ollinger Construction furnished written notice of termination to ICW at any time.

Be that as it may, in June 2006, Allain (the new owner of Ollinger Construction) met with an independent bonding agent named Jim Brashier (who worked for BancorpSouth Insurance Services)[7] to discuss possible ICW bonding coverage for a new project that Ollinger Construction was undertaking. (Allain Aff., ¶ 5.) At that meeting, Allain informed Brashier that Ollinger Construction "was under new ownership and management," and both men orally agreed that any outstanding agreements between Ollinger/Mostellar and ICW "did not apply to the new Ollinger Construction, Inc." (*Id.*, ¶ 7.) Furthermore, Brashier "agreed to evaluate Ollinger

---

Ollinger/Mostellar Associates, Inc.," which provides that "The name of the corporation has been **OLLINGER/MOSTELLAR & ASSOCIATES, INC.** but effective April 7, 2006, shall hereafter be changed to be known as **"OLLINGER CONSTRUCTION, INC."**" (Fuller Aff., ¶ 3 & Exh. B; doc. 29, Exh. 3.). An exhibit to the Articles of Amendment shows that, on April 10, 2006, Ollinger/Mostellar's shareholders and board of directors unanimously consented in writing "that the name of the Corporation shall, effective April 7, 2006 hereby be changed from **"Ollinger/Mostellar & Associates, Inc."** to **"Ollinger Construction, Inc."**" (*Id.*)

[6]    Above the salutation of the July 18, 2006 letter is the phrase "RE: *Principal: The company formerly known as Ollinger Mostellar & Associates, Inc.*" (*Id.*) Ollinger Construction now attributes special significance to this notation, as discussed *infra*.

[7]    Although he was not employed by ICW, Brashier was one of a number of agents designated by ICW as its "true and lawful Attorney(s)-in-Fact with authority to date, execute, sign, seal and deliver on behalf of [ICW], fidelity and surety bonds, undertakings, and other similar contracts of suretyship, and any related documents" during the 2005-2007 period. (Doc. 31, Exh. E, at 34.) There is no evidence, however, that Brashier signed any documents purporting to modify, terminate or waive ICW's rights under the Agreement.

Construction, Inc. as a new start-up entity under new ownership and management." (*Id.*, ¶ 8.) These discussions were not memorialized in any writing executed by ICW.

   C. ***The Mobile Regional Senior Community Center Project.***

  Armed with its new name and new ownership, Ollinger Construction obtained a contract from the City of Mobile to work on the Mobile Regional Senior Community Center ("MRSCC"). Ollinger Construction obtained bonding coverage from ICW for this project. (Allain Aff., ¶ 10.) In particular, on or about October 26, 2006, ICW issued Performance Bond No. 2174263 on Ollinger Construction in the amount of $1,624,213.00 for the "Mobile Senior Regional Community Center Phase I, Mobile, Alabama Project No. PR-026-02." (Doc. 31, Exh. E, at 26-28.) ICW likewise issued Payment Bond No. 2174263 on Ollinger Construction in the same amount for the same project. (*Id.* at 29-31.) On July 6, 2007, ICW and Ollinger Construction executed a Change Rider that increased the Performance/Payment Bond amount to $4,731,692. (*Id.* at 33.)[8] To be clear, both bonds and the change rider to the MRSCC project identify the contractor as "Ollinger Construction, Inc.," not "Ollinger/Mostellar & Associates, Inc."

  There is no evidence that ICW ever had Ollinger Construction or its new principal (Allain) execute a separate General Indemnity Agreement in connection with the multimillion-dollar payment and performance bonds that ICW issued as to the MRSCC project. The reasons for this omission are not germane to the Rule 56 Motion, and will not be examined here.[9]

---

  [8] Before Ollinger Construction obtained this additional coverage from ICW, Allain met with bonding agents Troy Wagener (a BancorpSouth Insurance Services employee) and Ford Mosby (an ICW employee) to discuss the project in February 2007. (Allain Aff., ¶ 11.) At that time, Wagener, Mosby and Allain orally "agreed that any agreements that BancorpSouth Insurance Services, Inc. or Insurance Company of the West may have had with Ollinger/ Mostellar & Associates, Inc. did <u>not</u> apply to the new Ollinger Construction, Inc." (*Id.*, ¶ 13.) Once again, no writing was executed to confirm this purported understanding, to terminate the February 2004 Agreement, or otherwise to waive or cut off ICW's indemnity rights under that Agreement.

  [9] Ollinger Construction's summary judgment brief portrays ICW as incompetent, careless, "dropping the ball," out of step with sound industry practice, and failing to follow through on its own stated objectives. (Doc. 31, at 3, 9-12.) To support this view (and no doubt embarrass ICW), Ollinger Construction points to internal e-mail chains that could reasonably be perceived as exhibiting a pattern of carelessness and overall lack of attentiveness to the Ollinger Construction matter by ICW personnel. Ultimately, however, it does not matter why ICW did not have Ollinger Construction and Allain sign a new General Indemnity Agreement. What matters is whether the February 2004 General Indemnity Agreement remained in full force and (Continued)

> D.  *Claims on the MRSCC Payment Bond.*

Unfortunately for both parties, ICW received multiple claims under the payment bond it issued for Ollinger Construction in the MRSCC project.[10]  On January 27, 2011, ICW sent a letter to Tom P. Ollinger (both individually and as purported representative of Ollinger Construction and Ollinger/Mostellar) and Lucille Jackson Ollinger (in her purported role as representative of Ollinger Construction) documenting the claims received by ICW on the bond. (Doc. 29, Exh. 4.)  In particular, the letter identified claims by B&E Equipment Company, Inc. in the amount of $90,000; by Floyd Lanier in the amount of $12,500; by Persons Service Co., Inc. in the amount of $33,000; and attorneys' fees and expenses exceeding $16,048.  (*Id.*)  On that basis, ICW called upon the addressees -- in fulfillment of their obligations in the February 2004 General Indemnity Agreement -- "to deposit with the company cash collateral in the amount not less than $200,000."  (*Id.*)  Ollinger Construction did not deposit the requested collateral, and never otherwise reimbursed ICW for the outstanding claims.  (Fuller Aff., ¶ 4.)  ICW ultimately settled and paid claims under the payment bond totaling $157,411.00, and tallies its total losses under the Ollinger Construction bond program, inclusive of attorney's fees and expenses, as $225,231.52.  (*Id.*)  ICW brought this exoneration of surety action against Ollinger Construction

---

effect against Ollinger Construction with respect to payments ICW made on bonds issued in the MRSCC project.  Similarly unhelpful are defendant's gratuitous accusations that ICW "has made misrepresentations of material facts and attempted to deceive this Honorable Court and especially Allain's Ollinger Construction to cover up ICW's failure to have Allain and Ollinger Construction, Inc. execute an indemnification agreement."  (Doc. 31, at 12.)  The Court finds no evidence of deception or a "cover-up" by plaintiff or its counsel in this matter.  To the contrary, defendant's own exhibits confirm that plaintiff's counsel was forthright in accurately explaining ICW's difficulties in locating the requisite underwriting file.  (Doc. 31, Exhs. L, M.)  Viewed in context, defendant's inflammatory, hyperbolic rhetoric accusing ICW of "deception and misrepresentations" in discovery appears unfounded, and serves only to obfuscate the real legal and factual issues joined herein.

[10]   By Ollinger Construction's reckoning, the blame for the delays that plagued the MRSCC project lies with the architect, non-party Knodel Associate Architects A.I.A., P.A.  In particular, defendant ascribes fault to "errors, omissions and ambiguities in the plans and specifications prepared by Knodel."  (Doc. 31, at 1-2.)  Of course, the reason(s) why claims were made on the MRSCC payment bond are not material to the critical question of whether Ollinger Construction must indemnify ICW for its losses in settling those claims.

seeking reimbursement of these expenditures and enforcement of the indemnification provisions of the February 2004 General Indemnity Agreement.[11]

### III. Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

### IV. Analysis.

#### A. *Governing Legal Principles.*

The basic principles of contract and surety law governing this action are uncontroversial. Under Alabama law,[12] sureties are afforded certain special protections, and indemnity

---

[11] Tom Ollinger and Lucille Ollinger were initially also named as defendants in this action. On February 10, 2012, however, Mr. and Ms. Ollinger and ICW filed a Stipulation for Partial Dismissal without Prejudice (doc. 15). Based on that Stipulation (which set forth no explanation for the signatories' decision so to stipulate), the undersigned entered an Order (doc. 16) on February 13, 2012, dismissing without prejudice ICW's claims against Mr. and Ms. Ollinger (but not Ollinger Construction).

[12] No party has suggested that the law of any state other than Alabama governs interpretation and enforcement of the February 2004 Agreement, which was executed in (Continued)

agreements like the February 2004 Agreement are deemed enforceable in accordance with their terms. *See, e.g., SouthTrust Bank of Alabama, N.A. v. Webb–Stiles Co.,* 931 So.2d 706 (Ala. 2005) ("When a surety satisfies the principal's obligation, it is entitled to reimbursement or restitution from the principal....").[13]  Indeed, it is well settled that "a surety in Alabama has the right to stand on its contract and to exact compliance with its stipulations, which may not be extended by construction or implication beyond the precise terms of the agreement." *Hightower and Co. v. U.S. Fidelity and Guar. Co.*, 527 So.2d 698, 703 n.1 (Ala. 1988).  More generally, Alabama law provides that "the general principles of contract interpretation apply" to payment/ performance bond contracts. *Bank of Brewton, Inc. v. International Fidelity Ins. Co.*, 827 So.2d 747, 752 (Ala. 2002); *see also Hightower*, 527 So.2d at 703 n.1 ("The contract of a surety ... is to be construed according to the intent of the parties and the implied condition of good faith," such that any attempt by either party to broaden or exceed the contract terms would breach the duty of good faith); *Fidelity & Deposit Co. of Maryland v. Jefferson County Com'n*, 756 F. Supp.2d 1329, 1335 (N.D. Ala. 2010) ("general principles of contract interpretation apply with equal force to surety contracts").  The same is true of indemnity agreements related to those surety contracts.

      Relevant tenets of contract interpretation under Alabama law include the following: "The issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide. … If the terms within a contract are plain and unambiguous, the construction of the contract and

---

Alabama by an Alabama corporation and Alabama residents concerning indemnity arrangements for performance and payment bonds issued predominantly (if not exclusively) for construction projects in Alabama.  Nor does any party assert that Ollinger Construction's obligations to the surety are fixed by the law of a state other than Alabama.  Under the circumstances (and in the absence of objection or argument to the contrary), application of Alabama law is appropriate.

[13]    *See also Doster v. Continental Cas. Co.*, 268 Ala. 123, 105 So.2d 83, 85 (Ala.1958) ("A surety's right of exoneration is established by our decisions...."); *Guarantee Co. North America USA v. Gadcon, Inc.*, 2010 WL 1382343, *2 (S.D. Ala. Apr. 2, 2010) ("Under Alabama law, sureties are granted legal protections, and indemnity agreements like the one at issue here are enforceable."); *Travelers Cas. and Sur. Co. of America v. Thorington Elec. & Const. Co.*, 2009 WL 4758729, *2 (M.D. Ala. Dec. 8, 2009) ("According to Alabama law, a surety is entitled to reimbursement from a principal for claims made pursuant to a valid indemnity agreement, so long as the payments were made in good faith.").

its legal effect become questions of law for the court." *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 696-97 (Ala. 2003) (citation omitted); *see also Mega Life and Health Ins. Co. v. Pieniozek*, 516 F.3d 985, 991 (11th Cir. 2008) (under Alabama law, whether contract is ambiguous or not is a question of law for the court). "General contract law requires a court to enforce, as it is written, an unambiguous and lawful contract." *Drummond Co. v. Walter Industries, Inc.*, 962 So.2d 753, 780 (Ala. 2006). Moreover, "[i]n determining whether the language of a contract is ambiguous, courts construe the words according to the interpretation ordinary men would place on the language used therein.... The words are given the meaning that persons with a usual and ordinary understanding would place on the words." *Progressive Specialty Ins. Co. v. Naramore*, 950 So.2d 1138, 1141 (Ala. 2006) (citations and internal quotations omitted); *see also Public Bldg. Authority of City of Huntsville v. St. Paul Fire and Marine Ins. Co.*, 80 So.3d 171, 180 (Ala. 2010) ("When interpreting a contract, a court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.") (citations omitted). "If the trial court finds the contract to be ambiguous, it must employ established rules of contract construction to resolve the ambiguity," and may only submit the ambiguity to the jury if application of these canons of construction does not resolve it. *Pieniozek*, 516 F.3d at 992 (internal quotations and citations omitted); *see also New Gourmet Concepts, Inc. v. Siedo Investments Co.*, 988 So.2d 961, 967 (Ala. 2007) ("When we find an agreement to be ambiguous, we must employ established rules of contract construction to resolve the ambiguity found in the inartfully drafted document.") (citation omitted).

    **B. *Whether the February 2004 Agreement Reaches Ollinger Construction.***

    As an initial matter, Ollinger Construction argues that the February 2004 Agreement does not apply to it at all. Certainly, defendant is correct that the named parties bound by that Agreement were Ollinger/Mostellar, Mr. and Ms. Ollinger, and Mr. and Ms. Mostellar. Ollinger Construction itself did not execute the February 2004 Agreement; indeed, there was no entity called Ollinger Construction until April 2006. Likewise, ICW never obtained an indemnity agreement from Allain, the new owner of Ollinger Construction as of May 2006. These facts lend superficial appeal to defendant's position that it is not required to indemnify ICW for the MRSCC claims because neither Ollinger Construction nor its principal ever executed a general

indemnity agreement as to the bonds that ICW as surety issued for Ollinger Construction's benefit on the MRSCC project.

The fundamental defect in defendant's contention that it need not repay ICW because it never executed a general indemnity agreement is that it ignores the plain language of the February 2004 Agreement. Recall that, in signing that Agreement, Ollinger/Mostellar acknowledged that it was covenanting and agreeing for itself and its "heirs, executors, administrators, successors, and assigns." (Doc. 34, Exh. 2, at 1.) There is no dispute that Ollinger Construction is, indeed, a successor of Ollinger/Mostellar (or, perhaps more accurately, the very same company, just with a different name). The record is pellucidly clear on this point. In April 2006, Ollinger/Mostellar prepared and filed articles of amendment to its articles of incorporation, confirming that "the name of the Corporation shall, effective April 7, 2006 hereby be changed from **"Ollinger/Mostellar & Associates, Inc."** to **"Ollinger Construction, Inc."**" (Fuller Aff., ¶ 3 & Exh. B; doc. 29, Exh. 3.) Under any reasonable reading of these facts, Ollinger Construction was either the very same entity or, at a minimum, a "successor" of Ollinger/Mostellar under the common, ordinary meaning of the term. *See, e.g., Black's Law Dictionary* (9th ed. 2009), at 1569 (defining "successor" as "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation").[14] Defendant does not credibly argue otherwise.

As successor-in-interest to the named principal (Ollinger/Mostellar), Ollinger Construction was bound by the clear terms of the February 2004 Agreement just as if it had executed the document itself. Accordingly, defendant cannot avert summary judgment simply

---

[14] *See also City of New York v. Turnpike Dev. Corp.*, 233 N.Y.S.2d 887, 890 (N.Y. Sup. 1962) ("In the case of corporations, the term 'successor in interest' ordinarily indicates statutory succession … as, for instance, when the corporation changes its name but retains the same property."); *see generally In re ReadyOne Industries, Inc.*, 294 S.W.3d 764, 770-71 (Tex.App. – El Paso 2009) ("[u]nder ordinary legal principles, a contracting party that has merely changed its name is still a contracting party," such that "a corporate name change does not affect the contractual obligations of parties existing prior to the name change") (citations omitted); *Pro Source Roofing, Inc. v. Boucher*, 822 So.2d 881, 884 (La.App. 2 Cir. 2002) ("The mere change in a corporation's name generally does not create a new entity, nor does it affect the corporation's property, rights or liabilities."); *Engineering Associates of New England, Inc. v. B & L Liquidating Corp.*, 345 A.2d 900, 903 (N.H. 1975) ("The fact that the defendant has changed its corporate name does not relieve it of any liability it may have incurred under its contract with the plaintiff.").

by pointing out that Ollinger Construction itself did not sign a general indemnity agreement in ICW's favor.[15]

### C.      *Whether the February 2004 Agreement Was Terminated.*

Next, Ollinger Construction trots out a series of arguments that the February 2004 Agreement was terminated before ICW received claims for the payment bond issued for Ollinger Construction in the MRSCC project. None of these contentions are persuasive.

The centerpiece of defendant's termination argument is the July 18, 2006 letter that Wayne and Virginia Mostellar's counsel sent to ICW. In defendant's words, "the Mostellar letter undoubtedly terminated the General Indemnity Agreement as to the Principal, Ollinger/Mostellar & Associates, Inc., and Indemnitors, Wayne B. Mostellar and Virginia Mostellar." (Doc. 31, at 7.) Even after drawing all reasonable inferences from the record in defendant's favor, the Court finds that this contention is demonstrably incorrect and devoid of factual or legal support. The inconvenient truth is that the July 18, 2006 letter did <u>not</u> purport to be a global termination of the February 2004 Agreement on behalf of all indemnitors and the principal. The law firm that wrote that letter did <u>not</u> represent Ollinger/Mostellar, Ollinger Construction, Allain, or Mr. and Ms. Ollinger; rather, that firm solely represented Mr. and Ms. Mostellar (who were indemnitors in their individual capacities in the February 2004 Agreement). On that front, the letter is unambiguous: "We represent Wayne B. Mostellar and Virginia M.

---

[15] Nor does Ollinger Construction advance its cause by suggesting that ICW had intended to require it to execute a general indemnity agreement, that ICW "dropped the ball" in that regard, and that best practices in the industry dictate that ICW should have had Ollinger Construction sign an indemnity document of its own. The question presented here is not whether ICW might have done something more to lock down Ollinger Construction's indemnity obligations. Rather, the question is whether the steps that ICW did take (*i.e.*, having Ollinger/Mostellar sign the February 2004 Agreement containing successor language) were sufficient to bind Ollinger Construction. The Court answers that question in the affirmative, as a matter of law. Whether ICW had intended to do something more, or whether sound bonding practice called for it to do something more, is immaterial. It is neither necessary nor appropriate for the Court to grade ICW's business practices and attention to detail; therefore, the undersigned declines to do so. The February 2004 Agreement is clear that ICW's future acceptance or release of other indemnity agreements as to Ollinger/Mostellar (or its successors) would not alter that entity's status as being bound by the terms of the February 2004 Agreement. (Doc. 34, Exh. 2, at § 17.) Accordingly, defendant cannot parlay ICW's failure to act to obtain new or additional indemnity agreements into a release of Ollinger Construction's preexisting indemnity obligations under the February 2004 Agreement.

Mostellar." (Doc. 31, Exh. A.)  The letter went on to state that "this is formal confirmation of termination pursuant to paragraph 20 of the General Indemnity Agreement." (*Id.*)  Because the letter was written solely on behalf of Mr. and Ms. Mostellar, the termination notice could only have been on their behalf.  No reasonable factfinder could conclude otherwise.[16]

The importance of this determination is underscored by the February 2004 Agreement's termination clause, which provided that any indemnitor could terminate the Agreement on 30 days' written notice to ICW, but that any such "notice of termination ***shall operate only with respect to those upon whose behalf such notice was given***." (Doc. 34, Exh. 2, at § 20 (emphasis added).)  Because the July 18, 2006 letter gave notice of termination only as to the Mostellars, it did not and could not have the effect of terminating the Agreement as to Ollinger Construction.[17]  With respect to Ollinger Construction, the Agreement by its terms was to "remain[] in full force and effect until terminated" (*id.*), which never happened.

---

[16]    In challenging the point, defendant ascribes talismanic significance to the "RE:" line of the letter, which states "RE: Principal: The company formerly known as Ollinger Mostellar & Associates, Inc." (Doc. 31, Exh. A.)  According to defendant, that statement implies that the July 18, 2006 letter was sent on behalf of both Ollinger/Mostellar and Mr. and Ms. Mostellar, such that it was intended to terminate the February 2004 Agreement for all of them.  Such a construction of this exhibit is bereft of factual support.  The letter could not be any clearer that it was sent solely on behalf of the Mostellars.  Counsel did not write, "We represent Ollinger/Mostellar & Associates, Inc., as well as Mr. and Ms. Mostellar."  To the contrary, he wrote, "We represent Wayne B. Mostellar and Virginia M. Mostellar."  Thus, the notice of termination contained therein could only have been on behalf of Mr. and Ms. Mostellar.  Given that the author of the letter did not represent Ollinger/Mostellar or its successor Ollinger Construction, it follows that he was not authorized to terminate the Agreement on their behalf.  The statement in the "RE:" section creates no ambiguity as to who counsel's client was, or who was terminating the Agreement; rather, it simply aids in identification of the subject indemnity agreement.  Although defendant is emphatic that the letter (and specifically the "RE:" section) creates genuine issues of material fact as to whether Ollinger/Mostellar terminated the February 2004 Agreement, the Court cannot endorse such a strained construction of the exhibit.  Simply put, no reasonable finder of fact could view the July 18, 2006 letter as terminating the February 2004 Agreement on behalf of anyone other than the Mostellars.

[17]    Defendant's brief imputes nefarious motive to ICW's apparently delayed production of the July 18, 2006 letter during discovery. (Doc. 31, at 5.)  No such inference of malfeasance or bad faith is warranted, for the simple reason that the exhibit in question is in no way deleterious to the claims ICW asserts herein against Ollinger Construction.  The letter does no harm to plaintiff's claims; therefore, plaintiff had nothing to gain from the alleged withholding of the document during the discovery process.  Besides, any remedy to defendant for such a discovery violation would not materially impact the Rule 56 analysis in this matter.

Not to be discouraged, defendant attempts to bolster its termination argument by contending that a series of contractual defaults by Ollinger/Mostellar and/or Ollinger Construction operated to invalidate the Agreement. In this regard, defendant's evidence shows that Ollinger Construction (or Ollinger/Mostellar) defaulted on the February 2004 Agreement in at least three different ways, by (i) changing the company's beneficial ownership when Mr. Ollinger bought out Mr. Mostellar's interest in the business; (ii) renaming the company in April 2006; and (iii) selling the company to Allain in May 2006. (Doc. 31, at 8.) Defendant suggests that these defaults rendered the Agreement invalid and unenforceable; however, such a conclusion is not supported by the contract language. The "Effect of Default" provision does not specify that the Agreement is negated by an Ollinger/Mostellar default; rather, it states that such a default confers on ICW rights to take possession of certain funds, property and rights; to prosecute and settle claims belonging to Ollinger/Mostellar; and to sell property assigned to it by virtue of the default. (Doc. 34, Exh. 2, at § 6.) There is simply no legal or contractual basis to support defendant's assertion that Ollinger/Mostellar's admitted default of the February 2004 Agreement stripped ICW of indemnity rights under that Agreement by rendering the contract invalid and unenforceable.

In yet another attempt to wriggle free of its indemnification duties, Ollinger Construction maintains that on several occasions ICW agents told Allain that ICW's agreements with Ollinger/Mostellar did not apply to Ollinger Construction, and that ICW would treat Ollinger Construction as a new start-up entity. (Doc. 31, at 8-12.) Accepting these facts as true for Rule 56 purposes, defendant remains bound by the February 2004 Agreement. In a section labeled "Modification," the Agreement stated that "[t]he rights and remedies of the Surety may not be waived or modified *except by written amendment signed by the Surety*." (Doc. 34, Exh. 2, at § 19 (emphasis added).) Ollinger Construction does not present a written amendment to the February 2004 Agreement in which ICW agreed to waive its contractual rights to indemnity. Whatever oral assurances ICW agents may have given to Allain lacked legal force and effect, because the contract itself left no doubt that waiver or modification of ICW's rights must be in writing signed by ICW. Absent such a document, ICW retained the full panoply of enforcement

remedies from the February 2004 Agreement at its disposal, irrespective of what Allain may or may not have been told by purported ICW agents.[18]

For all of these reasons, the Court finds that the February 2004 Agreement was not terminated as to Ollinger Construction, and that it remained in effect with respect to Ollinger Construction's indemnity obligations during the relevant time period.[19]

### D. Whether the February 2004 Agreement Applies to Payments Made by ICW on the MRSCC Project.

Having determined that the February 2004 Agreement applied to Ollinger Construction and had neither been terminated nor invalidated, the Court now examines the requirements of that Agreement. By the plain contract terms, Ollinger Construction promised to "indemnify and keep indemnified [ICW] against any and all liability for losses and expenses of whatsoever kind or nature, including attorney fees, and costs, by reason of having executed or procured the

---

[18] For that reason, the Court need not reach plaintiff's Motions to Strike the affidavits of Allain, Brashier and Wagener, nor need it address plaintiff's objections that one or more of its purported "agents" were not authorized to speak for ICW. Even if defendant's affidavits are accepted uncritically, the inescapable fact remains that there was no written termination, modification or waiver of the February 2004 Agreement as to Ollinger Construction; therefore, that agreement by its plain terms remains in full force and effect against defendant, no matter what else may have been said or intended. *See generally Marriott Int'l, Inc. v. deCelle*, 722 So.2d 760, 762 (Ala. 1998) ("The general rule of contract law provides that if a written contract exists, the rights of the parties are controlled by that contract and parol evidence is not admissible to contradict, vary, add to, or subtract from its terms.").

[19] In so concluding, the Court notes ICW's evidence that a state-court judge reached the same result concerning this same agreement in pending state-court litigation. Specifically, the record shows that on September 10, 2012, Mobile County Circuit Judge John Lockett entered an Order in litigation styled *Ollinger Construction, Inc. v. Knodel Associate Architects, A.I.A., P.A.*, concluding that "the General Indemnity Agreement of February 2004 … is valid and has not been terminated. The Agreement is binding on Ollinger Construction, Inc. as successor-in-interest to Ollinger/Mostellar & Associates, Inc." (Doc. 34, Exh. 1.) ICW has not argued in this case that Judge Lockett's conclusions must be adopted under the doctrine of collateral estoppel or otherwise, nor has it provided any legal framework within which this state-court ruling can be placed. Accordingly, the undersigned declines *sua sponte* to explore whether the state-court ruling must be followed on grounds of issue preclusion. *See generally Delgado v. Florida Dep't of Corrections*, 659 F.3d 1311, 1330 n.17 (11th Cir. 2011) ("Collateral estoppel, or, in modern usage, issue preclusion, means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.") (citations and internal quotation marks omitted). This Order is independent of, and not reliant on, the state court's ruling in the *Knodel* case.

execution of Bonds, or by reason of the failure of [Ollinger Construction] to perform or comply with the covenants and conditions of this Agreement." (Doc. 34, Exh. 2, at § 1.) It is undisputed that ICW issued payment and performance bonds for Ollinger Construction in connection with the MRSCC project in October 2006, and that it increased the bond amount to $4.7 million in July 2007. It is likewise undisputed that ICW received multiple claims on the payment bond, that Ollinger Construction failed and refused to provide collateral to ICW to cover those claims, and that ICW ultimately incurred considerable losses in settling and paying those claims, plus related attorney's fees and expenses. These facts unequivocally establish Ollinger Construction's liability to ICW as surety under the terms of the February 2004 Agreement and Alabama Code § 8-3-5.[20]

Notwithstanding the foregoing, defendant protests that the February 2004 Agreement does not apply to the payment/performance bonds issued for the MRSCC project because "ICW knew that Ollinger Construction, Inc. was a new entity to be treated as a new start-up company and issued a new indemnity agreement." (Doc. 31, at 11.) This argument is a non-starter. For the reasons already stated, any reasonable factfinder must conclude on this record that Ollinger Construction was covered by the February 2004 Agreement, regardless of whether in anyone's estimation ICW could or should have had Ollinger Construction and Allain execute a separate general indemnity agreement under some normative standard. Equally unavailing is defendant's argument that ICW "admitted that the General Indemnity Agreement … does not govern the 2007 bond when it voluntarily dismissed as defendants Mr. and Mrs. Ollinger." (Doc. 31, at 11.) No such admission appears in the record. To be sure, ICW did voluntarily dismiss its claims against the Ollingers without prejudice. But nothing in the record sheds any light on the reason for that stipulation. There may be a host of reasons completely unrelated to the merits of the claims why ICW may have elected to take such a dismissal. This Court may not speculate as to the reason, and neither may Ollinger Construction. *See, e.g., Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (citation

---

[20] That section reads in its entirety as follows: "Payment by a surety or endorser of a debt past due entitles him to proceed immediately against his principal for the sum paid, with interest thereon, and all legal costs to which he may have been subjected by the default of the principal." Ala. Code. § 8-3-5.

omitted). In short, plaintiff admitted nothing by stipulating to the dismissal without prejudice of its claims against the Ollingers, and such a stipulation cannot reasonably be deemed an admission that the February 2004 Agreement is invalid.[21]

### E. Damages.

The foregoing discussion conclusively demonstrates that the February 2004 Agreement is binding on, and enforceable against, Ollinger Construction. It also shows that ICW is entitled to recover from Ollinger Construction all losses and expenses of whatsoever kind or nature, including attorney's fees and costs, by reason of executing the MRSCC bonds. As proof of damages, ICW proffers the Affidavit of Russell Fuller, its Senior Surety Claims Counsel, who avers based on personal knowledge that ICW settled and paid the claims under the MRSCC payment bond for the total amount of $157,411.00, and that "ICW's losses and expenses under the Ollinger Construction bond program, inclusive of attorney's fees and expenses, total $225,231.52." (Fuller Aff., ¶¶ 4-5.) On that basis, ICW seeks entry of summary judgment in its favor in the total amount of $225,231.52. (Doc. 26, at 1.)

Defendant proffers three counterarguments, none of which have merit. First, defendant maintains that "there is a material issue of fact pertaining to the amounts allegedly owed insofar as ICW has never made demand on Ollinger Construction, Inc.; rather, the only demand made was to Tom P. Ollinger and Lucille J. Ollinger on January 27, 2011." (Doc. 31, at 13.) Defendant is correct that ICW's January 2011 demand letter to Ollinger Construction was mistakenly sent to Mr. and Ms. Ollinger, long after they had relinquished any role, involvement, or ownership interest in the business. But so what? Defendant identifies no provision of the February 2004 Agreement or applicable law that would require such a demand letter to be sent to the correct entity as a condition precedent to recovering damages. The fact that ICW sent a

---

[21] The same goes for defendant's unexplained assertion that if the February 2004 Agreement is to be enforced, it "must be enforced against all parties, including the remaining indemnitors, Tom P. Ollinger and Lucille J. Ollinger." (Doc. 31, at 15.) Defendant identifies no "all-or-nothing" contractual language or legal principle that would force ICW to pursue contractual indemnity claims against all indemnitors or none of them.

demand letter to the wrong people may be symptomatic of error or inattentiveness, but it does not wipe out plaintiff's damages claims.[22]

Second, defendant makes the bald statement that ICW cannot recover its attorney's fees that "accrued before a demand was ever properly made to Ollinger Construction, Inc." (Doc. 31, at 14.) Defendant cites no provision of contract, law or equity that would mandate (or even support) such a conclusion, and the Court is aware of none.

Third, defendant protests that "there is a material issue of fact pertaining to the amounts allegedly owed" because "[t]here has been no discovery conducted to verify the authenticity of the amounts allegedly owed by Ollinger Construction, Inc." (Doc. 31, at 14.) The time for discovery has long since expired. The applicable Scheduling Order (doc. 22) issued by Magistrate Judge Nelson on April 17, 2012 provided that "[a]ll discovery is to be completed on or before **September 5, 2012**." (Doc. 22, ¶ 3.) Had defendant wished to pursue discovery on damages, it had a nearly five-month window in which to do so. Defendant's failure to conduct such discovery, and its concomitant lack of preparedness to dispute plaintiff's damages allegations, does not give rise to a "material issue of disputed fact" that might preclude entry of summary judgment at this time in the full amount requested.

In short, ICW has made an uncontroverted showing that its recoverable losses incurred by virtue of Ollinger Construction's breach of its indemnity obligations under the applicable Agreement total $225,231.52. Defendant having shown no genuine disputes of material fact as to the propriety of that amount or the recoverability of those losses, summary judgment will be entered in plaintiff's favor in the full amount requested.

**V.   Conclusion.**

For all of the foregoing reasons, plaintiff's Motion for Summary Judgment (doc. 26) is **granted.** Judgment will be entered in favor of plaintiff, Insurance Company of the West, and against defendant, Ollinger Construction, Inc., in the total amount of **$225,231.52**.

---

[22]   At any rate, the record is crystal clear that ICW sent multiple demand letters to Ollinger Construction via the latter's former and present counsel at various times in early 2012, and that Ollinger Construction consistently failed and refused to honor those demands for collateral. (*See* Selden Aff. (doc. 34, Exh. 9), ¶ 3 & Exhs. A-C.) So any omission with respect to the January 2011 demand letter was since corrected by ICW's transmission and Ollinger Construction's rejection of repeated demands that it provide collateral in the first quarter of 2012.

-18-

Because this Order and the accompanying Judgment resolve all remaining triable issues as to all remaining parties herein, the Clerk's Office is **directed** to close this file for statistical and administrative purposes.

DONE and ORDERED this 20th day of December, 2012.

                                          s/ WILLIAM H. STEELE
                                          CHIEF UNITED STATES DISTRICT JUDGE